# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### EASTERN DIVISION

---

DOUG GOODMAN,            )
                                   )
      **Plaintiff/Counter-Defendant,**  )
**v.**                              )            **No. 1:21-cv-1003-STA-jay**
                                   )
**COMMERCIAL BANK AND**    )
**TRUST COMPANY,**         )
                                   )
      **Defendant/Counter-Plaintiff.**  )

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Before the Court are Defendant/Counter-Plaintiff Commercial Bank and Trust Company's Motion for Summary Judgment (ECF No. 22) filed November 22, 2021. Plaintiff Doug Goodman has responded in opposition, and Defendant has filed a reply. For the reasons set forth below, Defendant's Motion is **GRANTED**.

## BACKGROUND

Plaintiff is a farmer and operates his business as a Kentucky general partnership. In December 2020, Plaintiff presented two checks, one in the amount of $100,000 payable to his business and the other in the amount of $200,000 payable to Plaintiff himself, at a branch of Defendant Commercial Bank and Trust. Both checks were drawn on the account of Southern Risk Insurance Group, Inc., an insurance agency through which Plaintiff had purchased crop insurance for his business. Plaintiff requested that the teller at the bank exchange the insurance agency's checks for official checks issued by the bank. The teller did so and only later realized the insurance agency had insufficient funds to cover the checks. Defendant promptly stopped

payment on the checks. On January 11, 2021, Plaintiff filed a Complaint for the enforcement of the two official checks issued by Defendant in the total amount of $300,000, alleging that Defendant wrongfully refused to pay the checks or in the alternative that Defendant was liable for breach of contract. Defendant denied Plaintiff's allegations, filed a counterclaim of its own, and now seeks judgment as a matter of law on Plaintiff's claims.

To decide Defendant's Rule 56 Motion, the Court must first consider whether any genuine issue of material fact exists that might preclude judgment as a matter of law. A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite particular parts of the record and show that the evidence fails to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1). Local Rule 56.1(a) requires a party seeking summary judgment to prepare a statement of facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local R. 56.1(a). Defendant has filed a statement of undisputed facts, to which Plaintiff has responded, and for his part Plaintiff has filed a statement of additional facts.

## I.  Plaintiff's Farming Business and the B&G Partnership

Before reaching all of the parties' submissions on the evidence, the Court considers the proof concerning Plaintiff Doug Goodman and the structure of the business organizations through which he conducted his farming operation. The Court finds that the following facts are

undisputed for purposes of summary judgment, unless otherwise noted.  Plaintiff Doug Goodman is the sole shareholder of two corporations organized under the laws of the state of Kentucky, GoodLands, Inc. and The Willows Farm, Inc.  (Def.'s Statement of Undisputed Fact ¶¶ 1, 4, ECF No. 24; Pl.'s Statement of Add'l Fact ¶ 44, ECF No. 27-1.)    The two corporations established a partnership in 1996 known as B&G Partnership ("B&G"), a Kentucky general partnership.  (Def.'s Statement of Undisputed Fact ¶¶ 1, 2.)  B&G was formed as a general partnership in order to conduct farming operations and satisfy eligibility requirements for federal funds available to farming businesses.  (*Id.* ¶ 3.)  At all times relevant to this action, GoodLands, Inc. and The Willows Farm, Inc. were the sole partners of B&G. (*Id.* ¶ 4.)  While Plaintiff Doug Goodman is the sole shareholder of each corporation, Goodman in his individual capacity is not a partner in B&G.  (*Id.*)

Plaintiff has contested this description of his role in B&G, suggesting that B&G was effectively his alter ego.  For example, Plaintiff cites his own deposition testimony in which he stated that he was a partner in B&G and that there was no distinction between B&G conducting its farming operations and Plaintiff conducting farming operations in his own name.  Goodman Dep. 14:9-15:9, Sept. 2, 2021 (ECF No. 27-2).  Plaintiff also claims he was a co-lessee with B&G on the Missouri farmland on which the company later filed an unsuccessful crop insurance claim.  Plaintiff's characterization of his affairs, however, is inconsistent with other evidence about the structure of Plaintiff's enterprise and the organizations through which he conducted his farming business.  First, Plaintiff has not shown that he was a partner in B&G.  Plaintiff was not listed as a member of the partnership in the B&G partnership agreement.  *See* P'ship Agr. of B&G P'ship June 2, 1996 (ECF No. 24-1, Page ID 194-200).  And even if Plaintiff had been, acting on behalf of B&G as a partner or agent is simply not the same thing as conducting

3

business in one's own name.  Under Kentucky law, "[a] partnership is an entity distinct from its partners." Ky. Rev. St. § 362.1-201(1).

The fact that the only members of the partnership were two corporations in which Plaintiff was the sole shareholder does not alter this legal conclusion.  The undisputed evidence shows that Plaintiff was the sole shareholder in GoodLands, Inc. and The Willows Farm, Inc., the two Kentucky corporations listed as partners in B&G.  As business organizations and legal fictions, each corporation could only act through Plaintiff or other officers, directors, or agents. *Ky. Bar Ass'n v. Hines*, 399 S.W.3d 750, 768 (Ky. 2013) ("A corporation is a legal fiction and cannot act on its own" but "through its board of directors and officers and other agents.").  So it stands to reason that the corporations, which made up B&G, undoubtedly acted through their sole shareholder, Doug Goodman.[1]  Nevertheless, just as a partnership has a legal existence separate and distinct from the partners who make up the partnership, in Kentucky "a corporation is a separate entity from its shareholders."  *Schultz v. Gen. Elec. Healthcare Fin. Servs. Inc.*, 360 S.W.3d 171, 175 (Ky. 2012). Plaintiff has not shown then that Plaintiff and B&G or the corporations making up the B&G general partnership were merely alter egos.  In sum, Plaintiff's testimony about how he himself regarded the partnership or its constituent corporations does not create a genuine dispute about the fact that the partnership and the corporations each had their own distinct legal existence. Therefore, the Court finds the evidence about the structure of B&G to be undisputed, including the fact that Plaintiff in his individual capacity was not a partner in B&G.

---

[1] *See also* Pl.'s Statement of Add'l Fact ¶ 47 (asserting that Plaintiff "has authority to act, and is acting as Plaintiff in this lawsuit, for himself and for the benefit of and with the authority to act for, B & G Partnership and the two corporate partners).

## II.   B&G's New Madrid Lease and Crop Insurance

Having addressed the proof concerning the structure and organization of Plaintiff's business, the Court now turns to the rest of the evidence briefed by the parties.  On or about April 27, 2018, B&G entered into a lease for approximately 1,500 acres of farmland located in New Madrid County, Missouri ("the New Madrid Farm").  (Def.'s Statement of Undisputed Fact ¶ 5.)  The lease recited that the lessor of the land was leasing the property to "Doug Goodman of B&G Partnership," and Plaintiff signed the lease as "B&G Partnership Doug Goodman."  (*Id.*)[2] B&G leased the New Madrid County Farm intending to plant soybeans and/or corn during the 2018 crop season. (*Id.*)

B&G used Doug Martinek of Southern Risk Insurance Group Inc. ("Southern Risk") as its insurance agent to obtain crop insurance in connection with its farming operations.  (*Id.* ¶ 6.) Southern Risk assisted B&G in applying for a crop insurance policy issued by Diversified Crop Insurance Services ("Diversified") for the soybean and corn crop for crop year 2018 at the New Madrid Farm.  (*Id.* ¶ 7.)  Diversified accepted B&G's application and issued Multiple Peril Crop Insurance Policy No. 2018-160515-MO for crop year 2018 at the New Madrid Farm (the "policy").  (*Id.* ¶ 8.)  B&G was the named insured in the policy.  (*Id.* ¶ 9.)

---

[2] The parties disagree over whether Plaintiff in an individual capacity was a party to the lease.  Defendant asserts that B&G leased the property; Plaintiff points to the fact that he signed his name to the lease as well.  *See also* Pl.'s Statement of Add'l Facts ¶¶ 42, 43 (ECF No. 27-1). One of the questions in this case, which the Court discusses in more depth below, is whether Plaintiff had a putative legal claim against the insurance agent who procured crop insurance for B&G or whether that claim belonged only to the partnership.  The insurance policy addresses that question, and not the lease, though it could be read to say that Plaintiff was a party to the lease in his individual capacity.  The Court notes this open question of fact for the record but finds that it has little bearing on the other questions presented at summary judgment.

Southern Risk assisted B&G in making a claim under the policy on or about May 31, 2018, based on the fact that B&G could not plant corn on certain acreage at the New Madrid Farm due to "Excess Moisture/Rain." (*Id*. ¶ 10.)  Diversified denied the claim. (*Id*. ¶ 11.)  In a November 7, 2018 denial letter, Diversified explained (1) "that 1,444.8 acres did not meet the policy requirements for insurable acres having not been planted, harvested, or insured in one of the three pervious crop years" and (2) "that the peril of excess moisture existed prior to the start of the prevented planning insurance period." (*Id*. ¶ 12.)  B&G was not obligated to and in fact did not pay any insurance premiums for the policy covering the New Madrid County Farm acreage. (*Id*. ¶ 13.)

### III. Martinek and Southern Risk's Offer to Settle

After Diversified denied B&G's claim, Plaintiff accused Southern Risk of failing to obtain proper crop insurance for the New Madrid Farm. (*Id*. ¶ 14.)  Based on Plaintiff's belief that P&G would have had a covered claim had Southern Risk procured the correct coverage, Plaintiff and Martinek, the agent at Southern Risk, entered into discussions about Martinek compensating Plaintiff and/or B&G for the losses. (*Id*. ¶ 15.)[3]  Southern Risk paid Plaintiff $132,500.00, which included an official check in the amount of $100,000.00 dated August 16, 2019. (Pl.'s Statement of Add'l Fact ¶ 49.)  On or about June 6, 2019, Southern Risk, acting through Martinek, also issued a check payable to the order of B&G in the amount of

---

[3] Defendant disputes Plaintiff's assertion that Southern Risk owed a duty to Plaintiff in his individual capacity.  Defendant points out that B&G was listed as the insured under the crop insurance policy, not Plaintiff.  Defendant emphasizes then that any potential legal claim against Southern Risk or Martinek belonged to B&G, not Plaintiff, given that the policy was solely in the name of B&G.  *See* Def.'s Resp. to Pl's Statement of Add'l Fact ¶ 47.  Defendant disputes Plaintiff's claim that he reached an agreement with Martinek where Southern Risk and Martinek would compensate Plaintiff and B&G for the losses at the New Madrid Farm.  *Id*.  In any event, Defendant argues that the existence of such an agreement is immaterial for purposes of summary

$100,000.00. (Def.'s Statement of Undisputed Fact ¶ 16.) The June 6, 2019 check was drawn on Southern Risk's expense account at Defendant Commercial Bank and Trust. (*Id.*) Martinek wrote a second check on or about March 3, 2020. The second check, also drawn on Southern Risk's account with Defendant, was written in the amount of $200,000.00 and made payable to Plaintiff (and not B&G). (*Id.* ¶ 20.)

It is undisputed that at the times when Martinek delivered the checks to Plaintiff in June 2019 and March 2020, respectively, Southern Risk's account with Defendant did not have sufficient funds to cover the draws. (*Id.* ¶¶ 17, 18, 21, 22.) The parties dispute, though, whether Plaintiff knew that when he received the checks. Defendant cites testimony from Wallace Ward, a banker with Citizens Bank, that soon after receiving each check from Martinek, Plaintiff met with Ward to discuss the circumstances surrounding, first, the June 2019 check and, later, the March 2020 check. According to Ward's testimony, Plaintiff told him on each of these occasions that Southern Risk had insufficient funds to cover either check. Ward Dep. 21:24-25:1 ("To my recollection, he said I have the check but Mr. Martinek says the check is not good at this time."). This proof is admissible and would show that Plaintiff was aware that Southern Risk did not have sufficient funds to cover either the June 2019 or March 2020 checks when they were written. Fed. R. Evid. 801(d)(2)(A) (excluding from the definition of hearsay an out-of-court statement offered against an opposing party which was "made by the party in an individual or representative capacity.")

To contest the claim that he knew there were insufficient funds in Southern Risk's account at the bank, Plaintiff cites deposition testimony from Martinek. According to Martinek, he could not recall whether he had told Plaintiff about the lack of funds in the Southern Risk

judgment.

account to cover the checks. But this testimony is not enough to show that a genuine dispute exists over what Plaintiff knew when he spoke with Ward. Ward's testimony shows that Plaintiff knew there were insufficient funds in the Southern Risk account to cover both the June 2019 check and March 2020 check. The fact that Martinek could not recall what he told Plaintiff about his account or the availability of the funds does not actually call into doubt what Plaintiff told Ward about the checks. For purposes of summary judgment, Defendant has shown, and Plaintiff has not countered the showing, that Plaintiff knew Martinek's checks were not good when he received them from Martinek.

### IV. Plaintiff's Negotiation of the Southern Risk Checks

Plaintiff presented the June 6, 2019 check and the March 3, 2020 check for payment at Commercial Bank and Trust, and not the bank where B&G or Plaintiff held accounts. (*Id.* ¶ 24.) At some time prior to December 4, 2020, Plaintiff attempted to obtain payment on the June 6, 2019 check at Defendant's branch in Union City, Tennessee. (*Id.* ¶ 25.) At that time, Defendant informed Plaintiff that there were insufficient funds in Southern Risk's account to pay the June 6, 2019 check. (*Id.*) On March 11, 2020, Plaintiff attempted to obtain payment on the March 3, 2020 check at the same branch. (*Id.* ¶ 26.) Just as it did on the prior occasion for the June 2019 check, Defendant informed Plaintiff that there were insufficient funds in Southern Risk's account to pay the March 3, 2020 check. (*Id.*)

After Plaintiff had unsuccessfully attempted to obtain payment on the two Southern Risk checks and with knowledge that Martinek "hadn't written . . . cashable checks," Plaintiff and Martinek had discussions about where Martinek could raise the funds to cover the amount of the checks. (*Id.* ¶ 27.) Martinek identified the following possible sources for raising the money: (1) selling Southern Risk's book of business to at least three different potential purchasers; (2) a loan

from Martinek's parents; (3) a loan from a longtime, wealthy friend; and (4) a loan through Diversified. (*Id.*) Martinek was unable to make any of these options work. (*Id.*)

At 9:11 a.m. on December 4, 2020, Plaintiff texted Martinek and requested a meeting with him later that morning. (*Id.* ¶ 28.) Martinek responded that he was "waiting on the funds" and "still waiting for everything to go through" and did not then have the money to cover the checks. (*Id.*) Martinek told Plaintiff he hoped to have the funds "by lunch." (*Id.*) At 1:33 p.m., Plaintiff again texted Martinek and asked simply: "[a]nything on the funds[?]" (*Id.* ¶ 29.) Martinek responded at 1:34 p.m. and stated that he was "[s]till waiting." (*Id.*) A short time after that Martinek texted that the "funds may get here today." (*Id.*) Then, at 1:49 p.m., Martinek texted once more to say that he had "everything stopped." (*Id.*)

Plaintiff arrived at Defendant's Union City branch on Reelfoot Avenue with the two Southern Risk checks. (*Id.* ¶ 30.) Plaintiff adds that he was already on his way to the bank when Martinek sent his message at 1:49 p.m. about having "everything stopped" and did not respond to the text before he negotiated the checks at the bank. (Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 30.) Plaintiff also testified in his deposition that he believed there would be funds to cover the checks when he went to cash them on the afternoon of December 4, 2020. (*Id.* ¶¶ 28, 29.) The bank lobby was closed to customers on December 4, 2020 due to the Covid-19 pandemic, and Defendant's teller Judy Lofton met Plaintiff at the door to the bank. (Def.'s Statement of Undisputed Fact ¶ 31.) Plaintiff asked Lofton for two "cashier's checks" in exchange for the Southern Risk checks. (*Id.*) Lofton went back to the teller station in the bank lobby and printed two official checks payable to Plaintiff (and not B&G) in the amounts of

$100,000.00 and $200,000.00 respectively (the "official checks").  (*Id.* ¶ 32.)   The official checks were printed at 3:43 p.m. on December 4, 2020. (*Id.*)[4]

Shortly after leaving Defendant's branch with the two official checks, Plaintiff traveled to Simmons Bank to deposit the checks in his personal account. (*Id.* ¶ 38.) Simmons Bank called Defendant's branch to verify that the official checks were valid and spoke to Lofton, who verified the official checks. (*Id.*) Immediately after hanging up the phone, Lofton second guessed herself, checked the Southern Risk account balance, and discovered that the Southern Risk account did not have sufficient funds to pay the Southern Risk checks. (*Id.*) Lofton immediately informed a supervisor. (*Id.* ¶ 39.)  Defendant then put a stop payment on the two official checks and informed Simmons Bank on December 4, 2020, that the official checks would not be paid. (*Id.* ¶ 40.) Plaintiff learned on Tuesday, December 8, 2020, (at the latest) that Defendant had stopped payment on the official checks. (*Id.* ¶ 41.)

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if the party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Supreme Court has stated that "[t]hough determining whether there is

---

[4] Defendant asserts that the official checks meet Tenn. Code Ann. § 47-3-104(h)'s definition of "teller's checks" because Defendant is the drawer of the checks, and the drawee is another bank, BOKF, N.A.  Plaintiff does not dispute Defendant's claim.  However, whether the check meets a legal definition provide under Tennessee statute is, strictly speaking, not a statement of fact but a question of law for the Court to decide.

The parties also make a number of arguments addressed to Lofton's actions and what she may have failed to do in handling the transaction for the official checks.  The Court addresses that proof in further detail as part of its discussion of the questions of law presented in Defendant's Motion for Summary Judgment.

a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide." *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009).  In reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A court does not engage in "jury functions" like "credibility determinations and weighing the evidence."  *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 515 (6th Cir. 2019) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).  Rather, the question for the Court is whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.  *Anderson*, 477 U.S. at 252.  In other words, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52.  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

The parties have briefed Tennessee law in arguing their positions on the issues at summary judgment.  As in any case where the Court has jurisdiction based on the parties' diversity of citizenship and Tennessee law applies, the Court has as its task to anticipate or predict how the Tennessee Supreme Court would decide the issues based on all of the available data.  *Fox v. Amazon.com, Inc.*, 930 F.3d 415, 422 (6th Cir. 2019) (citing *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607 (6th Cir. 2012)).  This includes the published opinions of the Tennessee Court of Appeals.  *Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 358 (6th Cir. 2018) (citing Tenn. Sup. Ct. R. 4(G)(2) for the proposition that a published opinion of the

Tennessee Court of Appeals is "controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction").

## ANALYSIS

### I. Defendant's Mistaken Payment of the Southern Risk Checks

The primary issue presented in Defendant's Motion for Summary Judgment is whether Defendant is entitled to recover its payment on the Southern Risk checks due to the mistake of the bank teller. Under Tennessee law, a bank that pays an instrument like a check by mistake may recover its payment under certain circumstances defined in Tennessee's version of the Uniform Commercial Code. The Tennessee legislature has adopted the UCC for the purpose of making modern business transactions as simple and predictable as possible. *Auto Credit of Nashville v. Wimmer*, 231 S.W.3d 896, 902 (Tenn. 2007) ("The Uniform Commercial Code . . . has as its purpose to provide a simple and unified structure within which the immense variety of present-day [commercial transactions] can go forward with less cost and with greatest certainty.") (citation omitted). Tennessee's version of the UCC, Tenn. Code Ann. § 47–3–418, states that "if an instrument has been paid or accepted by mistake . . . , the person paying or accepting may, to the extent permitted by the law governing mistake and restitution, (i) recover the payment from the person to whom or for whose benefit payment was made or (ii) in the case of acceptance, may revoke the acceptance."[5] Tenn. Code Ann. § 47–3–418(b).[6] Comment 3 to §

---

[5] The Tennessee Commercial Code defines "acceptance" to mean "the drawee's signed agreement to pay a draft as presented." Tenn. Code Ann. § 47–3–409(a). The parties have cited no evidence to show that Defendant took any action to "accept" the Southern Risk checks, as the statute uses this term.

[6] Tenn. Code § 47–3–418(a) also permits recovery when a bank pays or accepts a check by mistake in two specific scenarios: "if the drawee pays or accepts the draft and the drawee acted on the mistaken belief that (i) payment of the draft had not been stopped pursuant to § 47–

47–3–418 explains that subsection (b) applies in cases where a drawee bank "has no duty to the drawer to pay . . . because available funds in the drawer's account are not sufficient to cover the amount of the check." *Id.*, cmt. 3.  The comment goes on to explain that "if the bank paid because of a mistaken belief that there were available funds in the drawer's account sufficient to cover the amount of the check, the bank is entitled to restitution." *Id.*

Defendant's case appears to be on all fours with these provisions of Tenn. Code Ann. § 47-3-418(b) and its comments. Defendant has shown that Plaintiff presented two checks at a Commercial Bank and Trust branch and requested that the bank issue "cashier's checks" in exchange for the checks.  The checks negotiated by Plaintiff were drawn on Southern Risk's account at the bank, though at the time of the negotiation there were insufficient funds in the account to cover the amounts of each check ($100,000.00 and $200,000.00).  Defendant's teller completed the exchange, taking the Southern Risk checks from Plaintiff and issuing two "teller's checks" for the same amounts payable to Plaintiff.  The Tennessee Commercial Code's Article 3 defines a "teller's check" as "a draft drawn by a bank (i) on another bank, or (ii) payable at or through a bank."  § 47–3–104(f).  The checks Defendant's teller issued to Plaintiff were drawn by Defendant on another bank and therefore meet this statutory definition as "teller's checks." Defendant now argues that the teller paid the checks by mistake and that Defendant is entitled to recover its payment due to her mistake.

---

4–403 or (ii) the signature of the drawer of the draft was authorized . . . ."  § 47–3–418(a). Subsection (a)'s right of recovery is "not affected by failure of the drawee to exercise ordinary care in paying or accepting the draft;" whereas, subsection (b)'s remedies are subject to "the law of mistake and restitution."  *Id.*  The Court discusses "the law of mistake and restitution" in further detail below.

The parties' only real dispute is whether Defendant's teller issued the teller's checks in exchange for the Southern Risk checks by "mistake," as that term is used in the statute. Article 3 of the Tennessee Commercial Code does not define "mistake" or "mistaken belief," the terms used in § 47–3–418(b) and comment 3. However, section 47–3–418(b) refers to "the law of mistake and restitution." Tenn. Code Ann. § 47–3–418(b) ("[I]f an instrument has been paid or accepted by mistake . . . , the person paying or accepting may, *to the extent permitted by the law governing mistake and restitution*, (i) recover the payment from the person to whom or for whose benefit payment was made . . . .") (emphasis added). Comment 3 to Tenn. Code Ann. § 47–3–418, the best evidence of the purposes and policies underlying the statute, specifically cross-references Restatement (First) of Restitution § 29. Tenn. Code Ann. § 47–1–103(c) ("In any dispute as to the proper construction of one (1) or more sections of chapters 1–9 of this title, the Official Comments pertaining to the corresponding sections of the Uniform Commercial Code . . . . in effect on July 1, 2013, in this state, shall constitute evidence of the purposes and policies underlying such sections . . . ."). Based on the text of the statute and its comments, the Court looks to the Restatement (First) of Restitution to define the terms "mistake" or "mistaken belief."

Section 29 of the Restatement (First) of Restitution reads as follows: "A person who, because of a *mistake of fact*, has paid money to another in the payment or the purchase of a bill of exchange or promissory note, is entitled to restitution in accordance with the rules stated in [Restatement (First) of Restitution] §§ 6–28, except as modified by the rules stated in §§ 30–38." Restatement (First) of Restitution § 29 (1937) (emphasis added). Section 6 of the Restatement defines the term "mistake" to mean "a state of mind not in accord with the facts," and section 7 of the Restatement defines the term "mistake of fact" as "any mistake except a mistake of law." Restatement (First) of Restitution §§ 6, 7 (defining a "mistake of law" as "a mistake as to the

14

legal consequences of an assumed state of facts."). Reading these provisions together, when Tenn. Code Ann. § 47–3–418 and comment 3 speak of a "mistake" or "mistaken belief," they simply mean "a state of mind not in accord with the facts."

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that no genuine dispute exists over the fact that Defendant's teller paid the Southern Risks checks by mistake. The actions of Defendant's teller Judy Lofton easily meet the Restatement's definition of "mistake." First and foremost, Lofton took two checks, one made payable to B&G and the other to Plaintiff, and exchanged them for two checks made out to Plaintiff only. Her failure to make the teller's check for $100,000.00 payable to the correct payee (B&G) constitutes a "mistake." Furthermore, Lofton testified that she processed the teller's checks without ever checking the balance of the Southern Risk account. She explained that she just made an assumption about the availability of the funds. Lofton Dep. 19:21–20:22, July 1, 2021 (ECF No. 24-5) ("Q. And when you got to that teller station did you check the account where these checks are payable through to see how much funds were in those accounts? A. No, sir. I was working under the assumption that the funds were available."). Lofton went on to testify that she clearly remembers she did not check the Southern Risk account balance and "made a mistake." *Id.* at 21:15–18. There is proof in the record that Lofton may have clicked through a computer flag about the account's insufficient funds as she processed the teller's checks, though Lofton's testimony about what she did is not clear on this point. *Cf.* Def.'s Statement of Undisputed Fact ¶ 36 with Lofton Dep. 35:18–36:11 (ECF No. 24-5). Lofton's explanation for the mistake was the fact that she felt rushed at the time she helped Plaintiff with the transaction. *Id.* at 23:8–11.

In addition to Lofton's testimony about what she did and her state of mind at the time of the transaction, Defendant also has evidence about the steps it took after it discovered the

Southern Risk account had insufficient funds. Less than hour after Lofton handed Plaintiff the teller's checks, Defendant contacted the bank where Plaintiff had deposited the teller's checks to notify it of the error and then placed a stop payment order on the checks. These subsequent steps buttress the conclusion that Lofton acted by mistake. *See State Bank & Trust v. First State Bank*, 242 F.3d 390, 2000 WL 1862690, at *9 (10th Cir. Dec. 20, 2000) (applying Oklahoma's version of UCC 3-418 and finding a similar course of action by a bank after it made a mistaken payment proved the mistaken nature of the payment).

All of the proof points to the conclusion that Lofton made a "mistake." Plaintiff disagrees because Lofton could not articulate any additional facts to explain why she felt rushed or, perhaps more importantly, why she assumed the account held sufficient funds to pay the draws. As Plaintiff sees it, Lofton could not have been mistaken about the facts "because she had no belief at all about any facts related to the funds." Pl.'s Resp. to Def.'s Statement of Fact ¶ 34 (ECF No. 27-1). Plaintiff's strained reading of the evidence, however, is belied by what Lofton said in her deposition testimony about her assumption regarding the state of the Southern Risk account and the availability of funds to pay the checks. The fact that Lofton could not articulate a rationale for her mistaken belief does not change the fact that she did, in fact, hold a mistaken belief. The only reasonable inference from Lofton's testimony is that she assumed the existence of facts about the sufficiency of the funds in the account and that her belief, or "assumption," was "not in accord with the facts." And at this stage of the case, Plaintiff has offered no other proof to rebut Lofton's testimony about her state of mind.

Plaintiff's emphasis on Lofton's "mistake" seems to be part of Plaintiff's legal theory that Defendant cannot recover its payment on the check due to Lofton's negligence. In Plaintiff's view, Lofton did not make a "mistake," at least not the sort of "mistake" which might make out

16

an equitable claim for reformation or rescission under Tennessee contract law.  Borrowing the analogy from contract law, Plaintiff argues that as a matter of equity, Lofton's acts cannot be a "mistake" justifying restitution under Tennessee payment law. But Plaintiff's argument overlooks Tenn. Code Ann. § 47–3–418(b), "the law of mistake and restitution," and the straightforward definition of "mistake" found in the Restatement (First) of Restitution.  *See also W.E. Richmond & Co. v. Security Nat. Bank*, 64 S.W.2d 863, 867 (Tenn. Ct. App. 1933) (holding that "ordinary negligence in failing to ascertain the facts is not alone sufficient to bar a recovery in cases of money paid under a mistake of fact"); 28 Williston on Contracts § 70:194 (4th ed.) ("One who mistakenly pays money that should not have been paid has a right to sue for restitution, even if the payments were negligently made.").  Plaintiff has cited no Tennessee cases applying Tenn. Code Ann. § 47–3–418(b) or the Restatement (First) of Restitution § 29 for the proposition that the mistaken payor's negligence precludes a claim for restitution.

Plaintiff relies instead on Tennessee contract cases where one party sought reformation or rescission of a contract due to mistake.  The Court finds Plaintiff's analogy from contract law unconvincing. First, applying the Tennessee common law of contracts and mistake is inconsistent with Tennessee's version of the UCC.  The Code incorporates other rules of law and equity but only to the extent that those rules are not "displaced" by the provisions of the Code. Tenn. Code Ann. § 47–1–103 ("Unless displaced by the particular provisions of chapters 1–9 of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, *mistake*, bankruptcy, or other validating or invalidating cause shall supplement its provisions.") (emphasis added).  Tenn. Code Ann. § 47–3–418 and its comments specifically cross-reference the Restatement (First) of Restitution and its definition of "mistake." The common law of

contracts and its principles of mistake, which Plaintiff advocates, would not supplement Tenn. Code Ann. § 47–3–418 but instead substitute the common law for the Restatement principles embraced in the comments to the statute.  That is not the law in Tennessee. *See Glazer v. First Am. Nat. Bank*, 930 S.W.2d 546, 549 (Tenn. 1996) ("Because the common law of conversion regarding consequential damages is directly opposed to § 47–4–103(5)—the UCC statute on the subject—by definition the common law cannot *supplement* the UCC; if we were to apply the common law, it would have to be *substituted* for § 47–4–103(5).").

The cases cited by Plaintiff reinforce the point.  Mistake as grounds for reforming or rescinding a contract under Tennessee common law has little in common with seeking restitution for a mistaken payment under Tenn. Code Ann. § 47–3–418. In Tennessee, a mistake may entitle a party to reform or rescind an agreement but only where there is clear and convincing proof of mutual mistake of both parties to the agreement. *Trent v. Mountain Commerce Bank*, 606 S.W.3d 258, 263 (Tenn. 2020) ("Mutual mistake 'is a mistake common to all the parties to the written contract or the instrument or in other words it is a mistake of all the parties laboring under the same misconception.'") (quoting *Collier v. Walls*, 369 S.W.2d 747, 760 (Tenn. Ct. App. 1962)); *Pugh's Lawn Landscape Co., Inc. v. Jaycon Dev. Corp.*, 320 S.W.3d 252, 261 (Tenn. 2010) (permitting rescission of a contract where a mistake is "innocent, mutual, and material to the transaction and unless the complainant shows an injury.").  By contrast, in cases of mistaken payment, nothing in Tenn. Code Ann. § 47–3–418(b) or § 29 of the Restatement requires proof of mutual mistake, much less proof by clear and convincing evidence, only proof that the payor made payment because of "a mistake of fact."  Applying Tennessee's common law of mistake in contract cases would therefore conflict with applying the Restatement's approach to mistake in payment cases.

Putting aside the differences between mistakes in contract law and mistakes in payment law, Tennessee courts apparently disagree over what role negligence and mistake should play in contract cases. For example, Plaintiff argues that the facts of his case are most "similar" to the facts in *Jones v. Jones*, 266 S.W. 110 (Tenn. 1924). The Tennessee Supreme Court in *Jones* declined to reform a deed, which contained a mistake, based on one party's "inattention" to the contents of the deed. *Jones*, 266 S.W. at 121. The *Jones* court remarked that "inattention or absence of thought which are inherent in negligence" did not amount to the kind of "mistake" required for reformation of the deed. *Id.* at 120. Plaintiff argues then that simple negligence or "inattention" cannot constitute the kind of "mistake" that might warrant equitable relief from a contract.[7] By extension of the logic in *Jones*, Plaintiff believes the same should hold true for Lofton's negligence or "inattention" in failing to check the balance of the Southern Risk account before exchanging the checks.

The Court finds that *Jones* is not entirely persuasive, involving as it did the reformation of a land deed, not restitution for a mistaken payment. More to the point, *Jones* is representative of an apparent split of authority among Tennessee courts over questions of mistake and negligence in contract law. The Tennessee Court of Appeals has commented that isolated statements about "inattention," like the one in *Jones*, when "taken out of context," are "not a correct statement of the law regarding mistake" in Tennessee. *Sikora v. Vanderploeg*, 212

---

[7] Plaintiff's argument on this point is not entirely clear. Plaintiff states in one part of his brief that "not all forms of negligence may be considered a mistake—mistake does not include willful and intentional neglect as occurred in this matter." Pl.'s Resp. in Opp'n 14. This suggests that Plaintiff's contention is that Lofton's failure to check the balance of the Southern Risk account was willful or intentional, though Plaintiff has adduced no evidence to establish that point. Plaintiff argues at the same time that even simple negligence or "inattention" may not rise to the level of a "mistake." As the Court has already explained, the decision of the Tennessee Court of Appeals in *W.E. Richmond* contradicts this proposition.

S.W.3d 277, 289–90 (Tenn. Ct. App. 2006) (citing *Jones* and *Myrick v. Johnson,* 160 S.W.2d 185, 188 (Tenn. Ct. App. 1941)). The Tennessee intermediate court explained that contract "reformation is denied only in 'extreme cases' where a party's fault 'amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.'" *Id*. at 290 (citing Restatement (Second) of Contracts § 157 & cmt. A at 416 and collecting cases).[8]

This Court is left then with two lines of Tennessee contract cases involving mistakes, one which suggests that gross or even simple negligence may preclude the equitable reformation of a contract and a second holding that only conduct approaching bad faith will limit reformation of a contract. The *Sikora* case illustrates one commentator's observation that "the Tennessee decisions are in serious conflict on the question of negligence and mistake" in the context of contract reformation or rescission. 21 Tenn. Prac. Contract Law and Practice § 6:44 (collecting cases and counseling the Tennessee Supreme Court to "resolve these divergent views at its next opportunity"). At the very least, the Tennessee case law on mistake and negligence in the context of contracts is not as clear as Plaintiff's argument would suggest. *See also* 27 Williston on Contracts § 70:48 (4th ed.) ("The mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude either avoidance or reformation.").

In the final analysis, Plaintiff's analogy to the law of mistake in contracts is inapposite. The Court finds it unnecessary to weigh in on the split of authority on Tennessee contract law in order to answer a question of payment law the Tennessee Commercial Code has already

---

[8] Plaintiff has also cited Restatement (Second) of Contracts § 151. The Court would point out that the Restatement (Second) of Contracts defines "mistake" with largely identical language from the Restatement (First) of Restitution § 6, that a "mistake" is a "belief that is not in accord with the facts." *See* Pl.'s Resp. in Opp'n 9 (quoting Restatement (Second) of Contracts § 151 (1981)).

addressed. The Restatement's definition of "mistake," which Tennessee's version of the UCC and its comments incorporate, is a "belief that is not in accord with the facts." This means a payor can seek restitution for a mistaken payment based merely on the mistaken belief of the payor alone. Plaintiff has not cited anything from the Restatement (First) of Restitution[9] to show that a payor's simple negligence somehow precludes the payor from seeking restitution.

In summary, the issue is not whether Lofton acted reasonably under the circumstances but whether she simply believed something to be true when it was not. Suffice it to say, Defendant has carried its burden to show that Lofton paid the Southern Risk checks by "mistake," as Restatement (First) of Restitution § 29 uses the term, and Plaintiff has not shown that a genuine dispute exists over that fact. Consistent with Tenn. Code. Ann. § 47–3–418 and the provisions of Restatement § 29, the Court's analysis now turns to the limiting conditions set forth in section 47–3–418(c) and sections 30 through 38 of the Restatement (First) of Restitution.

## II.  Plaintiff's Good Faith in Taking the Southern Risk Checks and Value Given

While paragraph (b) of Tenn. Code. Ann. § 47–3–418(b) permits Defendant to seek restitution for its mistaken payment of the Southern Risk checks, paragraph (c) denies a mistaken payor restitution "against a person who took the instrument in good faith and for value or who in good faith changed position in reliance on the payment or acceptance." Tenn. Code. Ann. § 47–

---

[9] Plaintiff does cite Restatement (First) of Restitution § 11, which states that "a person is not entitled to rescind a transaction with another if, by way of compromise or otherwise, he agreed with the other to assume, or intended to assume, the risk of mistake for which otherwise he would be entitled to rescission and consequent restitution." Restatement (First) of Restitution § 11 (1937). Other than to cite it, Plaintiff has not shown how this section applies in this case. There is no argument or evidence that Defendant assumed the risk of mistake by exchanging the Southern Risk checks for teller's checks, either with proof of an agreement to do so or with proof of banking custom or practice. *Id.* at (d) ("An agreement for the assumption of the risk of mistake may be by specific terms or it may be the result of custom or statute.").

3–418(c). There is no evidence to suggest that Plaintiff in good faith changed his position in reliance on Defendant's payment of the checks on December 4, 2020. Defendant argues that it is entitled to judgment as matter of law because Plaintiff cannot prove that he gave value for the Southern Risk checks or that he acted in good faith. The next issue presented then is whether Plaintiff may avail himself of these defenses and enforce the teller's checks, despite Defendant's mistaken payment.

The Court's analysis begins with the text of the statute itself. Under Tenn. Code. Ann. § 47–3–418(c), a mistaken payor may not seek restitution "against a person who took the instrument in good faith and for value." Comment 3 cautions that "[i]n most cases the remedy of restitution will not be available because the person receiving payment of the check will have given value for it in good faith." § 47–3–418, cmt. 3. The Court construes Tenn. Code. Ann. § 47–3–418(c) to define three requirements for the defense: (1) that a person "take an instrument;" (2) "in good faith"; and (3) "for value."

Before reaching the proof on Plaintiff's good faith and the value given for the Southern Risk checks, the Court pauses to consider which party bears the burden of proof on these questions. Defendant argues that Plaintiff has the burden of proof to establish Tenn. Code. Ann. § 47–3–418(c)'s defense to Defendant's restitution claim. Plaintiff has not actually responded to Defendant's argument on this point. As a matter of textual analysis, Tenn. Code. Ann. § 47–3–418(c) does not answer the question, though the comments to the statute speak of "defenses" available to a "Bank" as well as a "Buyer," that is, a payee like Plaintiff. *See* Tenn. Code. Ann. § 47–3–418, cmt. 2 ("Bank is obliged to pay the cashier's check and has no defense to that obligation."). In this case, Defendant's defense is its teller's mistake, and Plaintiff's is his good

faith and value given for the Southern Risk checks. However, Defendant, not Plaintiff, asserted as affirmative defenses that Plaintiff did not take the Southern Risk checks in good faith or for value.  Def.'s Answer, Aff. & Other Defenses ¶¶ 9, 10 (ECF No. 8).  Generally, a party asserting an affirmative defense bears the burden of proof. *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 284 (6th Cir. 2018). Strictly speaking then, as the party asserting the defenses, Defendant has the burden of proof on Plaintiff's good faith and value given for the Southern Risk checks under Tenn. Code. Ann. § 47–3–418(c).

The Court now considers whether there is proof in the record going to each of the elements of Tenn. Code. Ann. § 47–3–418(c). Concerning the first element, it is not entirely clear what Tenn. Code. Ann. § 47–3–418(c) means by "a person who took the instrument." Nothing in the statute or its comments clarifies whether this means the person who takes the instrument from the original issuer or a subsequent purchaser of the instrument or both.  Both comment 3 to the statute and Restatement (First) of Restitution § 33 refer to the "holder of the check."  Tennessee's version of the UCC defines a "holder" as "the person [i]n possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession." Tenn. Code Ann. § 47–1–201(b)(21). The Court need not sort out the ambiguity about what the statute means by "a person who took the instrument;" there is no real dispute in this case that Plaintiff was a "person who took the instrument," namely each of the Southern Risk checks, or that Plaintiff also meets the Code's definition of a "holder" of the checks.  One of the checks was made out to Plaintiff and the other to B&G, a partnership for which Plaintiff was presumably an authorized agent. Goodman Decl. ¶ 5 ("I am the sole agent authorized to act for B&G Partnership and both of its partners."). For purposes of Defendant's Motion for Summary Judgment then, Plaintiff qualifies as a "person who took the instrument."

23

Next, to construe "in good faith" and "for value," the Court looks to definitions found in Tennessee's version of the UCC.  For purposes of the UCC generally, "good faith" means "honesty in fact in the conduct or transaction involved." Tenn. Code Ann. § 47–1–201(19). The Tennessee Supreme Court has held that the UCC's general definition of "good faith" applies to Articles 3 and 4 of the UCC, which includes Tenn. Code. Ann. § 47–3–418(c).  *The Bank/First Citizens Bank v. Citizens & Assocs.*, 82 S.W.3d 259, 264 (Tenn. 2002) (noting that the Tennessee legislature has not adopted the most recent revision to the definition of "good faith"); *Contour Indus., Inc. v. U.S. Bank, N.A.*, 437 F. App'x 408, 414 (6th Cir. 2011) (noting that model UCC § 1–201(b)(20) adds the phrase "the observance of reasonable commercial standards of fair dealing").  The UCC has a general definition of the concept of "value," Tenn. Code. Ann. § 47–1–204, and then a definition specific to Article 3, Tenn. Code Ann. § 47–3–303.  Article 3's definition of "value" applies in this case: an instrument like a check is issued or transferred "for value" "if the instrument is issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due."  Tenn. Code Ann. § 47–3–303(a)(1)(3).

Plaintiff has introduced evidence that he and Martinek discussed Southern Risk paying for B&G's losses at the New Madrid Farm due to the agency's failure to procure the right crop insurance for B&G's 2018 crop at the property. Goodman Decl. ¶ 9 (ECF No. 27-3) ("After the failure to get the correct crop insurance, I had an agreement with Doug Martinek that he and Southern Risk Insurance Group, Inc. would pay what B&G Partnership would have been paid had proper crop insurance been in place on behalf of B&G Partnership."). Martinek denies that

there was such an agreement. Martinek Dep., Page ID[10] 260:2–4 (ECF No. 24-3) ("I don't recall any agreement."). Martinek admitted that once he and Plaintiff learned about the insurance company's denial of B&G's claim, Martinek "felt like at that point maybe morally[,] even though the insurance--the underwriting did not pay the insurance claim, morally obligated to help [Plaintiff] or pay [Plaintiff] what we thought might have been owed." Martinek Dep. Page ID 259:2–6. Recognizing the disputed question of whether there was an agreement between the parties and accepting Plaintiff's evidence as true, the Court will assume for purposes of summary judgment that Southern Risk offered to pay for B&G's losses at the New Madrid Farm.

Beyond the mere existence of Southern Risk's offer to pay, there is little or no evidence to show what other terms Plaintiff and Martinek discussed. Plaintiff's declaration states that notes were made outlining the terms of an agreement; however, Plaintiff has not made the notes part of the record and has otherwise not described the contents of the notes. Goodman Decl. ¶ 10 (acknowledging that the agreement was not in writing but stating that notes existed to document the terms of the agreement). And nothing else cited by Plaintiff spells out the substance of any agreement. Plaintiff's declaration speaks of "what [B&G] would have been paid had proper crop insurance been in place" and the "total amount owed" by Martinek and Southern Risk. *Id.* ¶¶ 9, 10. Plaintiff has not shown the value of B&G's covered losses or what amount Martinek agreed to pay.

Other evidence in the record suggests that the parties did not have a meeting of the minds on these key elements. Martinek testified, for instance, that Plaintiff had his own damages

---

[10] Defendant has made excerpts of the transcript of Martinek's deposition part of the record. However, the copy attached to Defendant's statement of undisputed facts does not include the transcript's page numbers. In lieu of citing the numbered pages of the transcript, the Court cites the page identification numbers used in the CM-ECF system for electronic court

calculations. Martinek Dep. Page ID 260:14–17 ("Q. And as far as a number, did you talk about a number, dollar amount? A. I -- I never did to Doug. Doug always used particular numbers. Q. Do you recall what those particular numbers were? A. 1500 acres and $310, I believe, an acre."). Even though Plaintiff had his own view of the amount of compensation owed to him, Martinek never agreed to a specific amount. *Id*. at Page ID 261:10–17 ("Q. So, you agreed with him as far as the acreage and -- what I was asking was did you agree with him about the dollar calculation of what might have been owed? A. I never said yes. I never committed to any dollar amount or anything. Q. So, you never committed to pay Mr. Goodman a specific amount? A. Not a specific amount, no."). Perhaps most important of all, Martinek testified that Plaintiff never gave Martinek anything, either on behalf of B&G or himself in a personal capacity, in return for Martinek's offer to make these unspecified payments. *Id*. at Page ID 262:2–6. This proof calls into doubt whether the parties ever had an enforceable agreement at all. *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991) ("In order to enforce a contract in Tennessee, the contract must result from a meeting of the minds, must be based upon sufficient consideration, and must be sufficiently definite to be enforced.").

Even so, the Court's task is to determine whether Plaintiff is entitled to the defenses available under Tenn. Code Ann. § 47–3–418(c) and whether he took each of the Southern Risk checks (1) in good faith and (2) for value. That inquiry is focused on the facts and circumstances then known to Plaintiff at the time he "took" each check from Southern Risk. The Court now considers the proof surrounding each check, written as they were at different times and under somewhat different circumstances.

**A. The June 2019 Southern Risk Check**

---

filings.

The June 2019 check in the amount of $100,000.00 was made payable to B&G. For reasons the Court has already discussed, Plaintiff knew the Southern Risk account had insufficient funds to cover the June 2019 check when Plaintiff received it, at or near the time it was written. Plaintiff accepted the "cold check" with knowledge that Martinek's Southern Risk account lacked sufficient funds and went to his banker for advice about how to negotiate the instrument. Goodman Dep. 108:22–25. After conferring with his banker about it, Plaintiff followed his banker's advice to attempt to exchange the check for a cashier's check at the bank on which the Southern Risk check was drawn, Defendant. Plaintiff attempted to make the exchange at Defendant's Union City branch but was told there were insufficient funds in the account. *Id.* at 86:16–87:13. Plaintiff then held the check another 18 months before attempting to negotiate it again in December 2020. This proof is inconsistent with a finding that Plaintiff accepted the June 2019 check with "honesty in fact in the conduct or transaction" represented by the check. Tenn. Code Ann. § 47–1–201(19). Plaintiff knew the check was not good at the time he received it from Martinek. The undisputed evidence shows that Plaintiff did not take the instrument in "good faith" for purposes of Tenn. Code Ann. § 47–3–418(c).

Just as Plaintiff did not take the check in good faith, the proof also shows that B&G, the party to whom the June 2019 check was made payable, did not give value for the check. There is no evidence that Southern Risk issued the check "as payment of . . . an antecedent claim against any person, whether or not the claim is due." Tenn. Code Ann. § 47–3–303(a)(1)(3). Not only were there insufficient funds in the Southern Risk account to back the check, there is no evidence that Martinek wrote the check for the specific amount ($100,000.00) at the specific time (June 2, 2019) for any reason other than a self-imposed moral duty to assist Plaintiff recoup his losses. There was no pending legal action between the parties, nor apparently even a threat of litigation.

The parties did not have a written settlement agreement or release, just a gratuitous gentleman's agreement that Martinek would endeavor to make Plaintiff whole.  Plaintiff testified that as time passed he was increasingly frustrated with the situation and continued to push Martinek for payment. Other than Plaintiff's own timeline and his perhaps understandable demand to be paid, there is no suggestion that B&G had "an antecedent claim" for the payment from Southern Risk in June 2019, only Martinek's offer to make payments to B&G.

Moreover, the proof shows that Martinek purchased an official check in the amount of $100,000.00 from Defendant in August 2019 with the intention of replacing the June 2019 check.  Martinek Dep. 65:7–10 (ECF No. 30-4) ("Q. So, it's your testimony that this check was intended by you as a replacement for the June 2019 check of the same amount? A. Yes."). Plaintiff admits that he received and successfully negotiated the August 2019 check and applied it to the total amount he believed Martinek owed him. In light of Martinek's uncontested testimony about using the August 2019 check to replace the June 2019 check, it cannot be said that B&G gave value for the June 2019, a check which Defendant had already declined to pay and which Martinek had written for gratuitous purposes.  *See* Tenn. Code. Ann. 47–3–418, cmt. 3 (noting that a gratuitous check written on an account with insufficient funds is subject to restitution).  Without proof to show why B&G was still entitled to the proceeds of the June 2019 check after receiving the August 2019 replacement check, B&G did not give value for the June 2019 check from Southern Risk.

Plaintiff argues that he, or B&G, gave value for the check because Plaintiff agreed to release any legal claim B&G may have had against Southern Risk.  According to Plaintiff's declaration, B&G released ("did give up") a "negligence" claim it had against Martinek and Southern Risk over the agency's failure to procure the correct insurance policy for B&G's 2018

28

crop at the New Madrid farm property in exchange for cash payments.  Goodman Decl. ¶ 12. Plaintiff also states that he may still take legal action against Martinek to enforce the remaining amounts due under their agreement. *Id.* ¶ 18 ("I may still file a lawsuit against Doug Martinek and/or Southern Risk Insurance Group, Inc., but the lawsuit will be to collect the amount remaining under the agreement made to pay for what B&G Partnership would have received had the correct crop insurance been purchased for B&G Partnership."). Plaintiff has nevertheless failed to show that the parties had entered into an agreement for such a release in exchange for Southern Risk's payments, much less in exchange for either of the specific checks at issue in this case. The proof at best shows that Martinek had agreed to make a gratuitous payment out of his sense of moral duty, not because Plaintiff made a reciprocal promise to release Martinek or Southern Risk from any further legal action.

And the lack of proof of such an agreement matters. In the absence of a valid release, Plaintiff still had the opportunity to file suit, even after Martinek delivered the Southern Risk check to him in June 2019. Under Tennessee law, B&G's possible cause of action against Southern Risk or Martinek had a three-year statute of limitations. *Tip's Package Store, Inc. v. Commercial Ins. Managers, Inc.*, 86 S.W.3d 543, 552 (Tenn. Ct. App. 2001) (holding that a claim against an insurance agent for the negligent failure to procure correct coverage has a three-year statute of limitations under Tenn. Code Ann. § 28–3–105(1)). So in the absence of a contractual agreement to release the claim, B&G still had legal recourse against Southern Risk or Martinek at the time Plaintiff received the June 2019 check and for that matter the March 2020 check. Plaintiff's unilateral assertion that B&G had "given up" its purported claim by June 2019 is not enough to show that B&G gave value for the Southern Risk check.

Viewing the proof in a light most favorable to Plaintiff, the Court concludes that Plaintiff did not take the June 2019 Southern Risk check in good faith and did not give value for it.  As a result, Defendant is entitled to judgment as a matter of law on its claim for restitution of the check under Tenn. Code. Ann. 47–3–418(b) & (c).

**B. The March 2020 Southern Risk Check**

The March 3, 2020 check in the amount of $200,000.00 was made payable to Plaintiff, not B&G. There is no evidence Plaintiff had any putative claim against Martinek or Southern Risk in anything other than his capacity as an agent or representative of the partnership or its member corporations. The Court has already described the proof surrounding the organization of Plaintiff's farming enterprise and the fact that Plaintiff operated through a partnership which was made up of two different closely held corporations in which Plaintiff was the sole shareholder. The proof shows that B&G was the named insured under the crop insurance policy for the 2018 crop at the New Madrid Farm and that Plaintiff had signed the lease for the farm on behalf of B&G. It follows that any losses at the New Madrid Farm traceable to Southern Risk's failure to procure crop insurance for the 2018 season were sustained by B&G, and not Plaintiff.  Plaintiff has otherwise offered no explanation for the fact that the March 2020 check was made payable to Plaintiff, and not B&G.

Putting aside the fact that any legal claim against Martinek or Southern Risk belonged to the partnership and not Plaintiff, the Court can assume without deciding for purposes of summary judgment that Plaintiff acted within the scope of his authority as agent for B&G when he received the March 2020 check.[11]   The circumstances of the March 2020 check were largely

---

[11] The fact that Plaintiff had legal authority to act on behalf of B&G does not alter the fact that Lofton made a "mistake" by exchanging a check made payable to B&G for a teller's

identical to the circumstances of the June 2019 check.  Just like the June 2019 check, there were insufficient funds to cover the March 2020 check at the time it was written, and Plaintiff was aware of this fact.  Plaintiff again consulted his personal banker about how to negotiate the "cold check" and took the banker's advice to try to exchange it for an official check.  Plaintiff attempted to negotiate the March 2020 check, just as he had the June 2019 check, at Defendant's Union City branch, only to be told the Southern Risk account had insufficient funds.  And Plaintiff took these steps with prior knowledge of Martinek writing a "cold check" in June 2019 that Southern Risk's account could not cover.  Plaintiff also knew Martinek did not have the current ability to make large cash payments and was in the process of trying to raise funds through a variety of sources. Based on this undisputed evidence, Plaintiff did not take the March 2020 check in "good faith" that Southern Risk had available funds to pay the check as written.

And the same issues about lack of value given for the June 2019 check are also present with respect to the March 2020 check. There is no evidence that anything other than a moral obligation motivated Martinek to write the March 2020 check when he did and for the amount he did.  In fact, Martinek suggested in his deposition that he had reservations about the March 2020 check due to his feeling that Plaintiff was not entitled to the money. Martinek Dep. Page ID 276:2–7 (stating that there were insufficient funds in the account to cover the March 2020 check and that Martinek did not "feel like [Plaintiff] deserved any more money").   Other than Plaintiff's bald assertion that B&G agreed to release any legal cause of action against Martinek or Southern Risk, there was no meeting of the minds on that point, at least as far as the evidence shows. And at the time he received the March 2020 check, Plaintiff and B&G still had legal

---

check made payable to Plaintiff.

recourse available against Martinek or Southern Risk. The proof is simply incompatible with a finding that Plaintiff took the March 2020 check for value or in good faith.

Viewing the evidence in a light most favorable to Plaintiff, the Court concludes that Plaintiff did not take the March 2020 Southern Risk check in good faith and did not give value for it. As a result, Defendant is entitled to judgment as a matter of law on its claim for restitution under Tenn. Code. Ann. 47–3–418(b) & (c).

### III.  Plaintiff's Knowledge Defendant Paid the Southern Risks Check by Mistake

Having determined that no genuine dispute remains over whether Plaintiff took the Southern Risk checks in good faith or for value, the Court need not also decide whether Plaintiff knew in December 2020 that Defendant paid the checks by mistake. In the alternative, even if there were triable issues going to the "good faith" or "for value" factors, there is no dispute that Plaintiff had reason to know Defendant paid the Southern Risk checks by mistake in December 2020.

Comment 3 to Tenn. Code. Ann. § 47–3–418(c) and the Restatement (First) of Restitution sections it cross-references arguably go further than the statutory text and define an additional element of the defense, that the person receive payment for the check without knowledge that the payor made the payment by mistake. According to Comment 3, the right of restitution under Restatement (First) of Restitution § 29 "is subject to Restatement of Restitution § 33 which denies restitution if the holder of the check receiving payment paid value in good faith for the check and *had no reason to know that the check was paid by mistake when payment was received*." § 47–3–418, cmt. 3 (emphasis added). In a similar fashion, Restatement (First) of Restitution § 33 states that "[t]he holder of a check or other bill of exchange who, having paid value in good faith therefor, receives payment from the drawee *without reason to know that the*

*drawee is mistaken*, is under no duty of restitution to him although the drawee pays because of a mistaken belief that he has sufficient funds of the drawer or that he is otherwise under a duty to pay." Restatement (First) of Restitution § 33 (1937) (emphasis added). The Court construes comment 3 to Tenn. Code. Ann. § 47–3–418(c), and the Restatement sections it incorporates, to include a requirement that the payee of the mistaken payment have no knowledge or reason to know that the payor paid the check by mistake.

The Court holds that no genuine dispute exists over the fact that Plaintiff had reason to know Defendant paid the Southern Risk checks by mistake. First, Plaintiff knew the Southern Risk checks were "stale" checks and asked to exchange them for cashier's checks any way. A check presented more than six months after its date is presumed to be stale and does not obligate the drawee bank to pay it. Tenn. Code Ann. § 47–4–404, cmt. 1. When Plaintiff presented the Southern Risk checks at Defendant's branch on December 4, 2020, both were "stale," as the Tennessee Code uses the term. The first check was nearly 18 months old, and the second more than nine months old. As a matter of Tennessee law, Defendant had no obligation to honor the checks, particularly since Plaintiff was not a customer of the bank. Tenn. Code Ann. § 47–4–404 ("A bank is under no obligation to a customer having a checking account to pay a check, other than a certified check, which is presented more than six (6) months after its date . . . .").

Second, Plaintiff had known the Southern Risk account had had insufficient funds to cover the checks from the time they were written. Plaintiff's attempts to exchange both checks for cashier's checks on prior occasions had been unsuccessful because there were insufficient funds in the Southern Risk account. Nothing had changed in the months since Plaintiff had last attempted to negotiate the checks. Martinek had already replaced the June 2019 check with a check in August 2019 for the same amount ($100,000.00). Plaintiff knew from dealing with

Martinek throughout 2019 and 2020 that Martinek was endeavoring to borrow money or raise capital from which he could pay Plaintiff. Martinek's plans had largely failed to come to pass.  In all, Martinek had only been able to pay Plaintiff a total of $132,500.00 prior to December 2020.

Third, there is no evidence to show why Plaintiff believed the Southern Risk account would finally have funds available to cover the stale checks on December 4, 2020. The parties' evidentiary submissions do not explain what occurred in the time leading up to December 2020 or how any new developments would have put Southern Risk in a better position to make good on the stale checks Martinek had written months before.  Whatever the source of the funds, it seems there was a possibility money might finally post to the Southern Risk account on December 4, at least according to text messages between Plaintiff and Martinek on the morning of the 4th. Goodman Dep., ex. 14 (ECF No. 24-1).  Plaintiff's first message from this conversation bears a time stamp of Friday, December 4, 9:11 a.m.

> Plaintiff: Hey can we meet around 10 this morning
>
> Martinek: I'm still waiting for everything to go through, can you send me a copy of the check you paid for rent over there
>
> Plaintiff: I thought you said everything was done.
>
> Martinek: It has (sic) I'm waiting on the funds.
>
> Plaintiff: You said today (sic) what time do you expect them
>
> Martinek: I'm hoping by lunch.
>
> Plaintiff: I'll see you then
>
> Martinek: Have Wallace send me a copy of that check
>
> Plaintiff: That has nothing to do with the issue here.
>
> Martinek: It does to me

> Plaintiff: I'm sorry but I have a signed contract and crop receipts and pp (sic) that you failed to insure. That's the issue. I did my due diligence. You failed to properly insure my crop
>
> Martinek: I know I did, I will call Ben and ask him

The comments raise a number of questions, which are mostly unanswered at summary judgment. Even so, viewing the conversation in a light most favorable to Plaintiff, Martinek's texts show that he merely "hoped" to have funds available "by lunch" that day.

But whatever else may have occurred after this initial exchange of messages, Martinek's later texts clearly show that Martinek did not intend to make the funds available on December 4, 2020, unless Plaintiff provided some unidentified documentation. Plaintiff testified that Martinek met him at Plaintiff's office later that morning. Goodman Dep. 121:8–22.  Plaintiff's expectation was that Martinek would deliver him a check for the full amount he believed he was owed at the meeting; however, that did not occur.  Goodman Dep. 121:10–19 ("Q. I just want to -- so what was -- what were you going to see him for? A. To get my check. Q. Well, you already had these checks, right? You said already-- A. He was going to pay me in full. These two checks did not indicate the full payment. Q. Okay, So this was -- you were talking about getting -- so when you had the [December 4] meeting, he was going to -- what were you going to do with the -- he was going to pay you everything in one lump sum? Is that what we promised to do? A. Yes.").  If Martinek promised to pay Plaintiff in a single lump sum at their meeting on the morning of December 4, 2020, and the Court assumes Plaintiff's testimony is true at this stage of the proceedings, Martinek did not make good on his pledge to deliver Plaintiff a check at their meeting.

The next part of the text message conversation occurred after the meeting and picked up at 1:33 p.m.

35

Plaintiff: Anything on the funds

Martinek: Still waiting, have you had a chance to find anything

Plaintiff: Yes

Martinek: Good, will you send me a copy of it

Plaintiff: No

Martinek: Why not

Plaintiff: I have a copy. Will show you when you have the funds. Out of friendship to you am I willing to do that. It has nothing to do with what you owe me anyway

Martinek: Out of friendship send me a copy of it now, funds may get here today

Martinek: Yes it has a lot to do with what I owe you

Plaintiff: I don't think so

Martinek: It doesn't matter what you think, I'd say Ben would think differently

Martinek: I've got everything stopped right now till I see something

Martinek: You going to send it to me (sic)

Plaintiff testified in his deposition that the time stamp on Martinek's message about getting "everything stopped right now" was 1:49 p.m.  According to Plaintiff, he was already on his way to Defendant's Union City, Tennessee branch by that time to exchange the Southern Risk checks for cashier's checks.  Plaintiff does not deny that he saw the text from Martinek, only that he did not respond to it and relied on Martinek's earlier statement to him about the funds. Goodman Dep. 136:17–21.

The Court holds that this undisputed proof shows that Plaintiff had reason to know Defendant paid the Southern Risk checks by mistake.  As is clear at this point, the Southern Risk checks were not just "stale" or "cold." There is no evidence that Martinek wrote the drafts with a

present intent to authorize payment to B&G or Plaintiff or that the Southern Risk account ever had the funds to cover the checks. Nothing about the events of December 4, 2020, changed that fact. Martinek's messages to Plaintiff were all couched in contingent language of "hope," "waiting," and just the mere possibility funds might clear the account later in the day. If anything, Plaintiff's testimony and his text messages with Martinek show that he was not expecting to negotiate the Southern Risk checks from June 2019 or March 2020 on December 4, 2020. Rather Plaintiff seemed to be under the impression Martinek would deliver him an entirely new check for the total amount Plaintiff believed B&G was owed. There is simply no proof that the parties intended for Plaintiff to negotiate the June 2019 check or the March 2020 check in December 2020 or that Plaintiff had reason to believe there would be funds to cover those checks. And Plaintiff disclosed nothing about the checks when he sought to exchange them sometime after Martinek had messaged Plaintiff about "everything" being "stopped" before 2:00 p.m. The evidence shows that Lofton processed the teller's checks at Defendant's Union City branch on Reelfoot Avenue at 3:43 p.m. Under these circumstances, Plaintiff had reason to know that the Southern Risk account did not have sufficient funds to cover checks totaling $300,000 on December 4, 2020. It follows then that Plaintiff also had reason to know that Defendant's payment of the checks was due to a mistake. Therefore, Defendant is entitled to judgment as a matter of law on its restitution claim.

## CONCLUSION

The Court holds that Defendant is entitled to judgment as a matter of law on its claim for restitution pursuant to Tenn. Code. Ann. 47–3–418(b) & (c). The undisputed evidence shows that Defendant paid the Southern Risk checks by mistake, Plaintiff did not take the checks in good faith or give value for them, and Plaintiff had reason to know Defendant paid the checks by

mistake.  Therefore, Defendant's Motion for Summary Judgment is **GRANTED**.  The Clerk is directed to enter judgment.

      **IT IS SO ORDERED**.

            **s/ S. Thomas Anderson**
            S. THOMAS ANDERSON
            CHIEF UNITED STATES DISTRICT JUDGE

            Date: February 24, 2022.